851 F.2d 1500
 271 U.S.App.D.C. 273
 Unpublished Disposition
NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
CLEVELAND & CUYAHOGA HEIGHTS RAILROAD CORPORATION, Petitioner,
v.
INTERSTATE COMMERCE COMMISSION and United States of America,
Respondents,
The Newburgh and South Shore Railway Company, Intervenor,
and consolidated cases 86-1249 and 86-1370.
 No. 86-1079.
 United States Court of Appeals, District of Columbia Circuit.
 June 7, 1988.
 
 Before BUCKLEY and WILLIAMS, Circuit Judges, and THOMAS F. HOGAN,* United States District Judge for District of Columbia.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This case was considered on the record from the Interstate Commerce Commission and was briefed and argued by counsel for the parties. The court has reviewed the issues presented and finds they occasion no need for a published opinion. See D.C.Cir.R. 14(c). For the reasons set forth in the accompanying memorandum, it is
 
 
 2
 ORDERED and ADJUDGED that the petitions for review be denied.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.R. 15. This instruction to the Clerk is without prejudice to the right of any party at any time to move for expedited issuance of the mandate for good cause shown.
 
 MEMORANDUM
 
 4
 Cleveland & Cuyahoga Heights Railroad Corp. (CCH) petitions for review of an Interstate Commerce Commission (ICC) decision on the disposition of an abandoned short line railroad near Cleveland, Ohio. The agency action is founded on a decision to give little credence to CCH or its cost estimates. Our review of the record gives us no reason to disagree with the ICC's determination.
 
 Background
 
 5
 This case presents three consolidated petitions for review of ICC orders in proceedings for abandonment of a railroad and subsequent offers to purchase the abandoned railroad under 49 U.S.C. Secs. 10903, 10905 (1982). On June 28, 1985, the Newburgh & South Shore Railway Co. (NSS) applied to the ICC for authorization to abandon its entire line (7.33 miles of mainline track and 20.64 miles of yard and sidings) in Cuyahoga County, Ohio, south of Cleveland. An "abandonment" occurs when a carrier discontinues service without the intent to resume such service. Section 10903 provides in pertinent part:
 
 
 6
 (a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may--
 
 
 7
 (1) abandon any part of its railroad lines; or
 
 
 8
 (2) discontinue the operation of all rail transportation over any part of its railroad lines;
 
 
 9
 only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance.
 
 
 10
 49 U.S.C. Sec. 10903.
 
 
 11
 An administrative law judge (ALJ) heard testimony for two days and concluded, inter alia, on December 3, 1985, that the public convenience and necessity permitted the abandonment. On December 10, 1985, the ICC authorized abandonment of the NSS line. The final step in the abandonment process is issuance of a certificate of abandonment, which occurs only if no bona fide offeror arranges to subsidize or take over operation of the line proposed for abandonment.
 
 
 12
 Upon authorizing abandonment, the ICC must publish its findings in the Federal Register. 49 U.S.C. Sec. 10905(c). Within ten days following publication, any person may offer to purchase the line. Id. Sec. 10905(c). In this case, three companies--petitioner CCH, Chicago, West Pullman & Southern Railroad Co. (CWP), and Cuyahoga Valley Railway Co. (CVR)--filed offers of financial assistance, i.e., offers to purchase and continue to operate NSS's line. An offeror must be found to be "financially responsible" by the ICC before the agency will permit the offeror to negotiate for the purchase of the railroad. Id. Sec. 10905(d) (financially responsible offeror is one who has offered proper amount of financial assistance, as determined by ICC under statute, to enable rail transportation to continue over line). If the ICC finds the offeror to be financially responsible, it postpones the issuance of a certificate of abandonment. Id. Sec. 10905(e). If the railroad and the offeror enter into an agreement that will provide continued rail service, the ICC must approve the transaction and dismiss the application for abandonment. Id. If the carrier and the offeror fail to agree on a price, either one may ask the ICC to set the price. The price set by the ICC is binding. Id.
 
 
 13
 In this case, the ICC, through the Acting Director of the Office of Proceedings, found only CVR to be a financially responsible offeror. On December 10, 1985, the ICC authorized abandonment of NSS's 7.33-mile railroad and determined the net liquidation value (NLV) of the line to be $2.3 million. Subsequently, the ICC issued three orders now challenged by petitioner. The challenged orders, identified by date of service, are as follows:
 
 
 14
 1) On December 27, 1985, the ICC rejected the offers of CCH and CWP to purchase the line, accepted as sufficient to initiate negotiations the offer of CVR to purchase 2.2 miles of the 7.33 miles of NSS line, and postponed the abandonment of the 2.2-mile segment. Appendix (App.) at 719-21.
 
 
 15
 2) On April 23, 1986, the ICC set the terms and conditions of the sale by NSS to CVR of the 2.2-mile segment for $523,000 and stated that the 5.13-mile remainder had been abandoned and from that point forward was beyond the ICC's jurisdiction. App. at 1104-19.
 
 
 16
 3) On May 30, 1986, the ICC authorized the sale of the 2.2-mile segment, ordered the abandonment application dismissed on the 2.2-mile segment on consummation of the sale, and retained jurisdiction to vacate the transfer of the 2.2 miles should this court decide adversely to CVR. App. at 1132-35.
 
 Discussion
 
 17
 CCH's main complaint is that the ICC did not consider its offer to buy the entire 7.33-mile line bona fide; a prime reason the ICC rejected the offer was because it was so low--$10,000. CCH argued that the line had a negative net liquidation value (NLV); in other words, CCH contended the line as a whole was worth less than nothing, because of the costs of demolition. In addition to the $10,000, CCH offered to pay NSS ten percent of revenues from railroad operations in excess of $600,000 annually, for five years.
 
 
 18
 Calculation of the NLV is critical because the ICC uses it to 1) evaluate offers as bona fide or not and 2) determine the transfer price if the railroad and the offeror are unable to agree. When the ICC sets the transfer price under 49 U.S.C. Sec. 10905(f), the transaction takes on the character of a condemnation proceeding. The statute forbids setting a price below the fair market value, id. Sec. 10905(f)(1)(C), and regulations define that term: "Fair market value equals constitutional minimum value which is the greater of the net liquidation value of the line or the going concern value of the line." 49 C.F.R. Sec. 1152.27(h)(6) (1986).
 
 
 19
 Among the administrative law judge's initial tasks was determining the NLV of the 7.33-mile line. He relied heavily, but not exclusively, on the figures provided by NSS; a representative of petitioner testified and produced alternative numbers. Much, but not all, of the differences in the NLVs put forward by the ICC, CCH, and others is attributable to wildly varying estimates of the cost of removing the nine bridges in the 7.33 miles of track. NSS, which had an obvious interest in generating a large NLV, produced two estimates of the costs of demolishing the bridges. The first estimate, $780,000, was based on the assumption that NSS generally would be required to remove all superstructures and install protective fencing on the abutments. The second, "worst case" estimate of $1,070,000 was based on the assumption that NSS would be required to remove not only the superstructures but all abutments and piers. Using the "worst case" figures, NSS calculated an NLV of $2.8 million. Petitioner produced a one-page statement from the president of Broadway Wrecking Co. that demolishing the bridges would cost $2.1 million, and petitioner's representative used that figure in suggesting an NLV of minus $1.5 million. App. at 648.
 
 
 20
 The ALJ considered the various estimates, stated that the evidence before him was not conclusive, and adopted the NSS "worst case" figure as the most reasonable. He noted, "Parties opposing applicant should have supported their estimates with statements or other backup material in order to disprove NSS estimates if they felt that these were understated." App. at 648. The ALJ arrived at an NLV of $2.3 million.
 
 
 21
 In submitting its offer to buy the 7.33 miles of line for $10,000, CCH included a new and even higher estimate from Broadway Wrecking Co. on the cost of removing the bridges: $5.7 million. Using this figure produced an NLV of minus $4.4 million. App. at 661. This figure was at variance with the ALJ's NLV by some $6.7 million.
 
 
 22
 The ICC decision maker, Jane F. Mackall, Acting Director of the Office of Proceedings, was not impressed by petitioner's estimates:
 
 
 23
 These statements make only the barest conclusions, and do not explain, even in brief manner, the bases for them. CCH also has not explained how its offer was calculated. The offer, above the $10,000 base amount, is, in effect, a price contingent on CCH's ability to conduct business successfully, and is therefore speculative. Therefore, I find that its offer is not bona fide. Moreover, CCH has failed to submit any evidence of its financial responsibility as required. The offer is rejected.
 
 
 24
 App. at 719 (citations omitted). The ICC also rejected the offer of CWP to purchase all of the stock and assets of NSS for $2.8 million in cash and a $600,000 promissory note. CWP failed to submit evidence of its financial responsibility, explain how its offer was calculated, or specify what part of its offer was attributable to the line as opposed to other assets of NSS.[1]
 
 
 25
 The successful offeror, CVR, offered $975,000 for 2.2 miles of line; it submitted a financial statement showing net assets of $12 million. The ICC found the offer bona fide and authorized negotiations between NSS and CVR. The parties were unable to agree on a price and CVR exercised its right to have the ICC set the price at fair market value.
 
 
 26
 By order of April 10, 1986, the full Commission rejected CCH's renewed argument that its offer was bona fide and set the transfer price for the 2.2 miles at $523,300. The full Commission reviewed CCH's offer and concluded: "It is better that a portion of the line be purchased and operated by a proven financially responsible offeror such as CV[R] than that service over the entire line be jeopardized at the hands of CCH." App. at 1110.
 
 
 27
 CCH attacks the ICC decision on three grounds: first, neither the Acting Director of the Office of Programs nor the Commission Chairman who confirmed the decision had the power to reject a bidder; second, the procedure violated due process and deprived CCH of the opportunity to show why its offer was best; and third, CCH's offer was best because it would have operated the entire line, while CVR took over only 2.2 miles.
 
 
 28
 The court's review of an ICC order is narrow. If the ICC decision is based on adequate findings supported by substantial evidence, the reviewing court may not substitute its own conclusions on the evidence. Illinois Cent. R.R. v. Norfolk & W. Ry., 385 U.S. 57, 66 (1966). CCH's assertion of error is that the ICC did not give the evidence offered by CCH the proper weight. However, the weight and credibility to be given evidence is for the Commission's expert discretion, especially in determining such matters as the net liquidation value of a railroad, the legitimacy of purchase offers, and the like. Here, the ICC did not view CCH as financially responsible, did not consider its cost estimates as reliable, and did not regard its offer as bona fide. We consider the ICC's views on these subjects supported by substantial evidence.
 
 
 29
 Additionally, we find petitioner's procedural arguments meritless. CCH waived its challenge to the authority of the Acting Director of the Office of Programs and the Commission Chairman because it failed to raise the claim before the ICC. United States v. L.A. Tucker Truck Lines, Inc., 344 U.S. 33, 37-38 (1952). Any error was harmless as the full ICC ratified the decision. CCH's due process argument is clearly frivolous as it was allowed a full and fair opportunity to air its case. See Mathews v. Eldridge, 424 U.S. 319, 333 (1976) (fundamental requirement of due process is opportunity to be heard at meaningful time and in meaningful manner).
 
 
 30
 Accordingly, the petitions for reviewed are denied.
 
 
 31
 So Ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 292(a)
 
 
 [1]
 CWP was not a party to the proceedings under review in Nos. 86-1249 and 86-1370. However, because CWP is a corporation whose interests are affected, we permit it to intervene under 28 U.S.C. Sec. 2348 (1982)